IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MILTON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JAMAR E. MILTON, APPELLANT.

Filed August 14, 2018.    No. A-17-281.

Appeal from the District Court for Douglas County: W. RUSSELL BOWIE III, Judge. Affirmed.

Michael J. Wilson, of Schaefer Shapiro, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

MOORE, Chief Judge, and ARTERBURN and WELCH, Judges.

ARTERBURN, Judge.

INTRODUCTION

Jamar E. Milton was convicted by a jury of second degree murder, first degree assault, and two counts of use of a deadly weapon to commit a felony. The district court subsequently sentenced Milton to a total of 58 to 82 years' imprisonment. Milton appeals from his convictions here. On appeal, Milton asserts that he received ineffective assistance of trial counsel. Upon our review, we find that the record is insufficient on direct appeal to address several of Milton's ineffective assistance of counsel claims. We find no merit to the remaining claims. As such, we affirm.

## BACKGROUND

The State filed an amended information charging Milton with first degree murder, pursuant to Neb. Rev. Stat. § 28-303 (Reissue 2016); first degree assault, pursuant to Neb. Rev. Stat. § 28-308 (Reissue 2016); and two counts of use of a deadly weapon to commit a felony, each pursuant to Neb. Rev. Stat. § 28-1205 (Reissue 2016). The charges against Milton stem from a shooting which occurred in the afternoon hours of June 29, 2015, at Miller Park in Omaha, Nebraska. Three individuals approached a vehicle which was parked in Miller Park. The vehicle was driven by Charles Fisher. After briefly speaking with Fisher's passenger, Jamymell Ray, the assailants took out guns and shots were fired from two of the guns. Ray was shot just below his right ear. He died as a result of the injuries caused by the gunshot. Fisher was shot in his left shoulder. He was treated and released after spending one and a half days in the hospital.

The State's theory at trial was that Milton, along with his younger brother, Jerrell Milton, and his friend, Shuntayvious Primes-Willis, shot Ray and Fisher as part of a conspiracy to rob Ray of marijuana he possessed. The State contended that Milton fired the shot which ultimately killed Ray and that Primes-Willis shot Fisher. In order to prove its theory, the State called Fisher to testify about the events of June 29, 2015.

Fisher testified that in the early afternoon hours of June 29, 2015, Ray telephoned him and asked for a ride to visit Ray's girlfriend in the hospital. When Fisher picked up Ray, Ray began using Fisher's cellular telephone. Fisher then began driving and ultimately stopped somewhere in Miller Park where he and Ray began smoking marijuana. Fisher indicated that Ray provided the marijuana and that Ray had additional marijuana in a "sandwich bag" with the top twisted shut. Fisher testified that while he and Ray were sitting in the car smoking, Ray continued to use Fisher's telephone. While they were still parked, "three little dudes" came up to the car. Fisher testified that two of the boys were on foot and one of the boys was riding a bike.

Fisher explained that he recognized the boys because they lived in the same neighborhood where he grew up. While he did not know their names, he did know that two of the boys were brothers who lived on Crown Point Avenue between 25th and 26th Street, in a yellow house with a "burnt-down garage." He also indicated that one of the brothers had a birthmark over his eye. Ultimately, Fisher identified the three boys as Milton, Jerrell, and Primes-Willis. We note that photographs taken of Milton which were admitted into evidence reveal that he has a large birthmark over his right eye.

Fisher testified that Primes-Willis was on the driver's side of the car, near where Fisher was seated. Jerrell was on the passenger side of the car, talking to Ray through the open window. Milton was "standing back" from the car, riding a bicycle. After about 15 minutes, Fisher saw Jerrell pull out a gun that was "bigger than him." Fisher described the gun held by Jerrell as being "chrome and black" with a "long clip" which came out the bottom of the gun. Fisher observed both Milton and Primes-Willis to also have guns. He described their guns as being black and looking the same as each other. When Fisher asked Jerrell what he was going to do with his gun, Fisher heard two gunshots. One shot had hit Fisher in the left shoulder. Fisher testified that he knew that Ray had also been shot because although he was still talking, he was "slurring" his words.

Fisher indicated that immediately after hearing the first gunshot, he "hit the gas," drove through a fence, and began driving through a golf course in Miller Park. Eventually, Fisher's car came out the other side of the golf course, went through another fence, and stopped in front of a neighborhood grocery store. At the grocery store, both Fisher and Ray exited the vehicle. Ray collapsed on the sidewalk and Fisher ran inside the grocery store to obtain help. Fisher testified that the owner of the grocery store instructed Fisher to get himself to the hospital and leave Ray at the store. Fisher then drove himself to a nearby hospital.

The State presented other evidence to corroborate Fisher's account of the events of June 29, 2015. The State offered evidence to demonstrate that Milton had called Fisher's cellular telephone three times on June 29. All three calls occurred between 2:48 and 3:34 p.m. In addition, Fisher's cellular telephone had called Milton's telephone at 2:59 p.m. The shooting occurred at approximately 3:53 p.m.

Law enforcement officers testified that no baggie of marijuana was found on Ray after the shooting had occurred. In addition, no baggie of marijuana was found in Fisher's vehicle when it was searched. However, approximately 2 hours after the shooting occurred, law enforcement conducted a search of Milton's mother's home, which was located on 25th and Crown Pointe Avenue. We note that photographs of the house reveal that it is a yellow- or beige-colored house with a detached garage that appears to have been burned down. During the search, officers did locate two baggies of marijuana with the tops twisted shut. Officers found the marijuana inside the tank of a toilet in the house's "main level" bathroom. At the time the officers searched the house, both Jerrell and Primes-Willis were present at the house, but Milton was not present.

Ultimately, Milton and Primes-Willis were arrested on July 6, 2015, at the home of one of their friends. When law enforcement searched the home where they were arrested, two guns were located in the friend's bedroom closet. A shell casing found near the scene of the shooting and a shell casing found in Fisher's car were fired by a black gun located in the closet. Testing of that gun revealed that neither Milton, Jerrell, nor Primes-Willis could be excluded as contributors of DNA found on the surface of the gun. The second gun found in the closet was silver and chrome in color. Present with the gun was an extended clip. DNA testing of the second gun revealed that Primes-Willis could not be excluded as a contributor of DNA found on the surface of the gun. Law enforcement testified that the weapon which had been used to shoot and kill Ray was never located.

After the State rested, Milton filed a motion to dismiss the charges against him, but, when that motion was overruled, he did not present any further evidence.

After hearing all of the evidence, the jury convicted Milton of second degree murder, first degree assault, and two counts of use of a deadly weapon to commit a felony. The district court subsequently sentenced Milton to 30 to 40 years' imprisonment for his second degree murder conviction, 10 to 12 years' imprisonment for his first degree assault conviction, 10 to 20 years' imprisonment for his use of a deadly weapon to commit a felony conviction, and 8 to 10 years for his second use of a deadly weapon conviction. The court ordered the sentences to run consecutive to each other. As a result, Milton was sentenced to a total of 58 to 82 years' imprisonment.

Milton appeals his conviction here.

## ASSIGNMENT OF ERROR

On appeal, Milton asserts that he received ineffective assistance of trial counsel in various respects.

## STANDARD OF REVIEW

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. See *State v. Castillo-Zamora*, 289 Neb. 382, 855 N.W.2d 14 (2014). We determine as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. See *id*.

## ANALYSIS

On appeal, Milton alleges that his trial counsel was ineffective in six different respects: (1) failing to make a motion to suppress the statements he made immediately after his arrest, (2) failing to make a motion to suppress evidence found during the search of his mother's home, (3) failing to recall Fisher to testify about whether he lied during his initial testimony, (4) failing to investigate and subpoena witnesses who were in Miller Park at the time of the shooting, (5) abandoning his alibi defense, and (6) failing to hire a forensic psychiatrist to testify regarding his mental health. We will address each of Milton's allegations of ineffective assistance of counsel below. First, however, we detail the relevant law which overlays our analysis of ineffective assistance of counsel claims which are made on direct appeal.

Milton is represented in this direct appeal by different counsel than the counsel who represented him at the trial level. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise the issue will be procedurally barred. *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015). The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017). The determining factor is whether the record is sufficient to adequately review the question. *Id*.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Ortega*, 290 Neb. 172, 859 N.W.2d 305 (2015).

When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *State v. Casares, supra*. General allegations that trial counsel performed deficiently or that trial counsel was ineffective are insufficient to raise an ineffective assistance claim on direct appeal and thereby preserve the issue for later review. *Id*.

Appellate courts have generally reached ineffective assistance of counsel claims on direct appeal only in those instances where it was clear from the record that such claims were without merit or in the rare case where trial counsel's error was so egregious and resulted in such a high level of prejudice that no tactic or strategy could overcome the effect of the error, which effect was a fundamentally unfair trial. *Id*. An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice. *Id*. See, also, *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

We now address each of Milton's allegations of ineffective assistance of trial counsel.

*Motion to Suppress Statements Regarding Guns.*

During the trial, the State offered evidence regarding the events surrounding Milton's arrest on July 6, 2015. A warrant was issued for Milton's arrest on July 2. On July 6, law enforcement, including Agent Jacob Slagle, who was a Special Deputy U.S. Marshall assigned to the Metro Fugitive Task Force, received information that Milton and Primes-Willis may be inside a house located on "North 20th and Lothrop." Officers proceeded to that house. After they arrived, they set up a perimeter around the house. While officers were still discussing how to proceed, Milton and Primes-Willis came out the front door of the house. Slagle immediately recognized Milton as a result of his prominent facial birthmark. Slagle ordered Milton to put down the cellular telephone he had in his hands and to get on the ground. Slagle then placed Milton in handcuffs and helped him back on his feet.

Prior to searching Milton, Slagle asked him, "Do you have anything illegal on you that I need to know about?" Milton responded "[N]o, I left my gun upstairs in the closet of the room I was in." During Slagle's trial testimony, he admitted that he had not informed Milton of his rights prior to asking him if he had anything illegal on his person. Slagle also testified that he always asks that question prior to conducting a search.

While Slagle was arresting Milton, the owner of the house Milton was in, Sherice Gresham, spoke with law enforcement. She gave law enforcement permission to enter her home and to search her home. She testified at trial that one of the law enforcement officers made a statement to her after Milton was in handcuffs, however, Milton's objection to the content of that statement was sustained and Gresham was not allowed to explain what was said. Gresham did testify to her response to the officer's statement, which she directed at Milton: "I was just like, really? I was like, why would y'all do that? Why would y'all be disrespectful like that?" She was also allowed to testify that in response to her comment, Milton "just turned and looked at [her] like, yeah." Gresham testified that Milton appeared to be sorry for bringing guns into her house.

On appeal, Milton alleges that his trial counsel was ineffective for failing to file a motion to suppress his statement that his gun was upstairs in a closet. Specifically, he asserts that his statement was not admissible because when Slagle questioned Milton about whether he had anything illegal, Milton was in custody but had not yet been informed of his rights. Milton further asserts that Slagle "knew or reasonably should have known" that his question to Milton about whether he had anything illegal would elicit an incriminating response. We find that the record is sufficient to review this allegation. We conclude that the allegation has no merit because Milton

cannot demonstrate he was prejudiced by the admission of his statement into evidence. Because we find that Milton cannot demonstrate prejudice, we need not address whether trial counsel's performance was deficient. See *State v. Lee*, 265 Neb. 663, 658 N.W.2d 669 (2003) ("[a]n appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it").

Milton's statement about his gun being upstairs in the closet was relevant because it provided a direct link from Milton to the guns found in Gresham's home and one of those guns was directly tied to the shooting of Fisher and Ray. However, contrary to Milton's arguments on appeal, there was other evidence which directly tied Milton to the guns found in Gresham's home. The guns were found in a room of the home in which Milton had just been in along with Gresham's son and Primes-Willis, a room to which Gresham had already given the police consent to search. And, perhaps most importantly, Milton could not be excluded as a contributor to the DNA found on the surface of one of the guns. Given this evidence, even if Milton's statement about the guns being upstairs in the closet had been excluded, there was still evidence to support the State's theory that the guns were connected to Milton and Primes-Willis.

Moreover, given the other evidence of Milton's connection to the shooting, including, Fisher's identification of Milton as one of the armed assailants and telephone calls between Milton's telephone and Fisher's telephone just prior to the shooting, the impact of Milton's statement to police about the guns was minor. We find that Milton's assertion of ineffective assistance of counsel fails because he cannot demonstrate that he was prejudiced by counsel's failure to file a motion to suppress his statement to Slagle. Even if counsel had filed such a motion and even if such motion was sustained, the exclusion of Milton's statement would not have had any significant impact on the outcome of the trial.

Milton also alleges that his trial counsel was ineffective for failing to file a motion to suppress his statements to Gresham. Again, we find that the record is sufficient to review this allegation, but we conclude that the allegation has no merit. As we discussed above, Milton's statements and actions toward Gresham are relevant only to prove his connection to the guns in the closet. Other evidence sufficiently established that connection. As a result, Milton cannot show he was prejudiced by the admission of the statements into evidence.

*Motion to Suppress Evidence Obtained*
*From Search of Mother's House.*

As we mentioned above, at trial the State offered into evidence two baggies of marijuana which were found during a search of Milton's mother's home approximately 2 hours after the shooting. When law enforcement first contacted Milton's mother, Iyannia Moss, at her home, they ordered her and everyone else present inside the house to come out so that they could conduct a "protective sweep" to look "for individuals that may be a threat to [officer] safety from inside that house." After finishing the protective sweep, officers were instructed to "hold the residence" while a search warrant was obtained. During the initial time period, Moss was not cooperative with law enforcement. However, during the next hour, while officers were waiting for the search warrant, one officer, Officer Dustin Morris, was able "to build a rapport" with Moss. Morris testified that Moss "calmed down tremendously [and] apologized for some of her words and actions." At some

point, Moss asked Morris how much longer she and the other residents were going to have to wait outside. When she was told that officers were waiting for the search warrant to be completed and signed by a judge, Moss indicated that she was now willing to consent to a search of the residence. Moss then read and signed a permission to search form and officers entered the house, where they found the baggies of marijuana in a bathroom on the main level.

On appeal, Milton alleges that his trial counsel was ineffective for failing to file a motion to suppress the baggies of marijuana on the basis that Moss' consent to search her house was coerced by law enforcement. We find that the record is sufficient to review this allegation. We conclude that the allegation has no merit because Milton cannot demonstrate he was prejudiced by the admission of the marijuana into evidence.

The baggies of marijuana found in Moss' house were relevant to the State's theory that Milton was guilty of felony murder because Ray was shot and killed as part of a robbery. Essentially, when the State offered evidence of the baggies of marijuana into evidence it was attempting to demonstrate that the marijuana in the baggies was the same marijuana that Ray had possessed prior to the shooting and that Milton, Jerrell, and Primes-Willis had shot Ray in order to obtain the marijuana for themselves. However, the jury found Milton guilty of second degree murder and, thus, necessarily found that he was not guilty of felony first degree murder. Because the jury found Milton not guilty of first degree murder, it apparently concluded that there was not a significant enough link to tie the marijuana found in Moss' house to the shooting.

When we consider the totality of the evidence presented to prove Milton's guilt, along with the fact that the jury appears to have discounted the marijuana found in Moss' house, we conclude that the marijuana was a minor portion of the State's case that did not prejudice Milton's defense. Because the jury found Milton guilty of second degree murder and not guilty of first degree murder, Milton cannot show that the admission of the marijuana into evidence was in any way prejudicial to him.

*Other Allegations of Ineffective*
*Assistance of Trial Counsel.*

Milton raises four additional allegations of ineffective assistance of trial counsel, as we outlined above. However, upon our review, we conclude that the record on direct appeal is insufficient to address these claims.

Milton alleges that his trial counsel was ineffective in failing to call Fisher to testify a second time. Milton asserts that after Fisher testified for the State, he saw Fisher in the Douglas County Jail and Fisher told him that "the State had forced him to testify falsely in his case." Brief for appellant at 23. We conclude that our record on direct appeal is insufficient to address this claim because it does not include any information about the alleged conversation between Milton and Fisher after Fisher's testimony, nor does it include information about trial counsel's knowledge of this conversation or any actions counsel may have taken regarding this conversation.

Milton alleges that his trial counsel was ineffective in failing to investigate and subpoena additional witnesses who were present in Miller Park at the time of the shooting. He asserts that these witnesses would have testified that they observed a truck chasing Fisher's car through the park while the occupants of the truck shot toward Fisher's car. We note that although Milton does

not refer to the potential witnesses by name, he nonetheless sufficiently alleges his claim of ineffective assistance by specifically iterating what these witnesses would have testified to if subpoenaed by trial counsel. See *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014). However, we conclude that our record on direct appeal is insufficient to address this claim because it does not provide information about whether trial counsel was aware of these witnesses or whether she attempted to locate the witnesses. In addition, it does not reveal any information about counsel's trial strategy.

Milton alleges that trial counsel was ineffective in abandoning his alibi defense during trial. Specifically, he alleges that trial counsel failed to "subpoena Milton's alibi witnesses who would have placed Milton elsewhere at the time of the shooting." Brief for appellant at 23. We note that our record indicates that trial counsel did file a Notice of Alibi in the district court prior to trial. That document was intended to notify both the court and the State that Milton intended "to rely upon an alibi in the defense of the charges filed against him." However, at trial, counsel did not offer any testimony regarding Milton's alleged alibi. Ultimately, we conclude that our record on direct appeal is insufficient to address this claim because it does not provide any information about trial counsel's trial strategy and how such strategy may have developed or changed after counsel filed the Notice of Alibi.

Finally, Milton alleges that trial counsel was ineffective in failing to consult a forensic psychiatrist to evaluate Milton's mental health. He alleges that his mother's testimony at the hearing on his motion to transfer the case to juvenile court provided notice to counsel that Milton suffered from serious "anger issues" which have resulted in him receiving disability benefits. Milton further alleges that had trial counsel had him evaluated by a forensic psychiatrist, counsel "could have raised the defense that [his anger issues] are sufficiently acute that Milton is prone to dissociative states such that his ability to form the intent necessary to commit murder was absent at the time of the shootings." Brief for appellant at 24. We conclude that our record on direct appeal is insufficient to address this claim.

## CONCLUSION

We find that Milton was not denied effective assistance of trial counsel when counsel failed to make a motion to suppress Milton's statements regarding the guns or when counsel failed to make a motion to suppress the evidence found during the search of Milton's mother's house. We find that the record is insufficient to review Milton's remaining claims of ineffective assistance of trial counsel.

AFFIRMED.